**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **DONALD R. R., JR.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 19-cv-721-MAB**[2] |
| | ) | |
| **COMMISSIONER of SOCIAL** | ) | |
| **SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff, represented by counsel, seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

### PROCEDURAL HISTORY

Plaintiff applied for disability benefits in August 2015, alleging disability as of October 15, 2015. After holding an evidentiary hearing, an ALJ denied the application on June 11, 2018. (Tr. 25, 40). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] In keeping with the court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Docs. 12 & 36.

Plaintiff raises the following points:

1. The ALJ erred in evaluating Plaintiff's physical RFC.
2. The ALJ erred in evaluating the opinion of Dr. Paul Carter, M.D.
3. The ALJ erred in evaluating Plaintiff's mental RFC regarding concentration, persistence or pace.
4. The ALJ erred in evaluating Plaintiff's subjective allegations.

Plaintiff filed a reply in response to Defendant's social security brief. However, Plaintiff simply reasserts the same arguments he made in his opening brief.

## APPLICABLE LEGAL STANDARDS

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform his former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 404.1520.

An affirmative answer at either step three or step five leads to a finding that the

plaintiff is disabled. A negative answer at any step, other than at step three, precludes a finding of disability. The plaintiff bears the burden of proof at steps one through four. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show that there are jobs existing in significant numbers in the national economy which plaintiff can perform. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See, Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

# THE DECISION OF THE ALJ

The ALJ followed the five-step analytical framework described above. He determined that Plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. He is insured for DIB through December 31, 2020.

The ALJ found that Plaintiff had severe impairments of cervical spine degenerative disc disease, dysthymic disorder-late onset, alcohol abuse in remission, panic disorder without agoraphobia, depressive disorder, insomnia, anxiety/generalized anxiety disorder, and ADHD without hyperactivity.

The ALJ found that Plaintiff had the residual functional capacity (RFC) to perform work at the medium exertional level limited to carrying fifty pounds occasionally and twenty-five pounds frequently, sitting for at least six of eight hours and standing and/or walking for about six of eight hours, occasionally climbing ladders, ropes, and scaffolding, and avoiding concentrated exposure to dangerous workplace hazards such as exposed moving machinery and unprotected heights. The ALJ determined Plaintiff can understand and remember simple instructions and carry out simple, routine and rote tasks that require little independent judgment or decision-making. He can have no more than brief and incidental public interaction on less than an occasional basis. He must work in a stable work setting where there is little daily change in terms of tools used, the processes employed, or the setting itself, and change, when necessary, is introduced gradually. He can have occasional interaction with co-workers and supervisors.

Based on the testimony of a vocational expert, the ALJ concluded that Plaintiff is

unable to perform any past relevant work. The ALJ found there are other jobs that exist in significant numbers in the national economy that Plaintiff can perform.

<u>**THE EVIDENTIARY RECORD**</u>

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to Plaintiff's arguments.

**1.      Agency Forms**

Plaintiff was born in 1959 and was 58 years old on the date of the ALJ's decision. (Tr. 193). Plaintiff said he stopped working in October 2015 because of his conditions. He previously worked as a janitor at both a hospital and Walmart. (Tr. 196-197).

In a Function Report submitted in December 2015, Plaintiff said his severe anxieties about working affect his ability to work. He said he helps his mother with housework including vacuuming, laundry, mowing, and taking care of a little dog. He said he can go out alone, such as going to the grocery store twice a week for half an hour. He said he does not spend much time with others, is often very nervous and is afraid to go to church because he has to use the bathroom a lot. He said his condition affects his ability to concentrate, understand, and follow instructions. He said he does not handle stress well, cannot pay attention for long, gets along with authority figures, and is "not too good" at following spoken instructions, but is "pretty good" at following written instructions. (Tr. 202-209).

## 2.  Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing in February 2018. (Tr. 53).

Plaintiff said he worked at Maytag on assembly lines prior to a mental breakdown. (Tr. 66). He also worked as a janitor at a hospital where he had to lift and carry fifty pounds, but he stopped working there due to stress, anxiety and depression. He had a nervous breakdown some months before working there in 2010 and was hospitalized for three days, but he was able to work there over time because his psychiatrist got him work leave. (Tr. 59-61, 66-67). He quit this job as well but later returned. Plaintiff worked at Logan Primary Care as a janitor but stopped working there also due to anxiety. (Tr. 61). He said he worked for about a month as a janitor at Walmart. Though he wrote in his work history report that he lifted about fifty pounds at this job, he testified that he only lifted around fifteen pounds but had trouble even with that and dragged the weight. Plaintiff said he quit working at Walmart due to stress, anxiety, and trying to concentrate on job duties. (Tr. 56-59). One employer made accommodations for Plaintiff in 2014 by lessening the heavier duties and restricting duties that trigger anxiety. (Tr. 74). Plaintiff said he came home after his shifts and immediately went to sleep due to crying and being drained and exhausted from the stress, panic and anxiety he experienced while working. (Tr. 67).

Plaintiff said he used to have panic attacks but has less now since he has not been working. He said his anxiety creates tension in his neck and shoulders, stress makes him

"panicky," depression causes him to cry due to worrying about having to go into work, and his panic disorder causes social issues with trying to get out, do things, and deal with the public. Plaintiff said he does not go out much anymore, will go to the grocery store either early in the morning or late at night to avoid people, he does not go to church, and he attended a therapy group but stopped going because it was too stressful for him to talk about his problems with others. (Tr. 68-71). He said he has difficulty working with people and being supervised because it makes him nervous, confused, paranoid about his job performance, and fearful that he is not doing his job correctly and will be criticized. (Tr. 75).

A vocational expert (VE) testified that a person with Plaintiff's RFC could not perform their past work of cleaner in a hospital. The ALJ presented hypotheticals to the VE which corresponded to the ultimate RFC findings. The VE testified this person could do jobs such as hand packager, general production helper, and general production worker. (Tr. 81-85).

3.      Relevant Medical Records

Plaintiff presented to Alyson Wolz, an advanced practice nurse, at GOYA Health, Ltd. five times between June 2013 and April 2014, complaining of chronic anxiety, trouble relaxing, panic related to his job situation, stress, decreased concentration, fatigue, muscle tension, sudden heart rate changes, shortness of breath (SOB), choking sensations, abdominal distress, dizziness, and avoidant behaviors. (Tr. 280, 283, 286, 288, 290). Plaintiff said his employer was unwilling or unable to make accommodations for him, so

he quit his job. (Tr. 288, 290). However, his employer later offered Plaintiff to come back to work and offered accommodations for his anxiety. (Tr. 286). He said he attempted to train for auto mechanics but had a panic attack while at the school signing up for classes and did not return. (Tr. 283). He said he experienced less anxiety since he quit and said medications improve his symptoms. (Tr. 286, 288). Plaintiff said he wanted to be on disability because he felt so much better when he did not have to go to work. (Tr. 283).

At these appointments, APN Wolz noted intact memory, judgment and insight, a normal concentration and attention span despite one appointment where she noted it as decreased, and she noted his mood and affect as normal despite one appointment where she noted an anxious mood and blunted affect. (Tr. 281, 284, 287, 289-290). APN Wolz's assessments consisted of ADD without hyperactivity, major depressive disorder, anxiety disorder, panic disorder, and agoraphobia, and plans included deep breathing exercises, muscle relaxation exercises, medication and physical exercise. (Tr. 281-282, 284, 287, 289-291).

Plaintiff presented to Jacquelyn Muniz, a Doctor of Psychology, at GOYA Health, Ltd. eight times between June 2014 and December 2014, stating his problems began in 2009 following a breakdown. Plaintiff reported one hospitalization in the past for mental health issues and a history of therapy. He complained of depression, anxiety regarding working and applying for different jobs, paranoia, insomnia, hypersomnia, irritability, frustration, confusion, feeling lost, hopelessness, indecisiveness, a limited attention span, anhedonia, low self-esteem, fear of embarrassing himself in front of others, panic attacks,

trouble leaving home, obsessions, compulsions, pulling out his hair, difficulty with social situations, social withdrawal, feeling like others are spying on him or plotting to hurt him, wondering if the voices he hears at work saying he is germy and loud are real, trouble completing tasks/projects/duties, and relationship problems. (Tr. 272, 292, 294, 296-297, 299-301). At times, Plaintiff reported an improvement in symptoms, feeling less anxious when off work, and forgetting about exercising. (Tr. 300-301).

At these appointment, Dr. Muniz noted Plaintiff had an anxious, dysthymic, flat mood and affect, he had appropriate thought processes, he had intact memory, judgment and concentration, and he had slowed, under-productive speech. (Tr. 272, 292, 296-297, 299-301). Dr. Muniz's assessment included ADD without hyperactivity, generalized anxiety disorder, major depressive disorder, panic disorder, and agoraphobia, and plans included Plaintiff returning for additional appointments, therapy, medication management, exercise, deep breathing, and finding different employment. (Tr. 272, 292-297, 299-301).

Plaintiff presented to APN Wolz in January and August 2015, complaining of fatigue, difficulty concentrating, muscle tension, excessive worry or rumination, sudden changes in heart rate, SOB, feelings of choking, nausea or abdominal distress, feeling dizzy or unsteady, avoidant behaviors, ADD, depression, anxiety, and panic. (Tr. 274, 277). He said stress worsens the symptoms, and said, "My work gives me all kinds of anxiety." (Tr. 274-277). APN Wolz noted no depressed mood or anxiety, normal concentration and attention, and intact judgment and insight. APN Wolz's assessment

included ADD without hyperactivity, major depressive disorder, generalized anxiety disorder, panic disorder, and agoraphobia, and plans included medication and exercise. (Tr. 275-276, 278).

Plaintiff presented to Anita Lloyd, a licensed clinical professional counselor, at The H Group and underwent Adult Diagnostic Assessments in October 2015, and February, June, and October 2016. (Tr. 306, 381, 409, 575). Plaintiff reported being a good worker before he had his breakdown in 2009. He reported working in a hospital as a janitor but had a lot of problems with nervousness, and he reported working at Walmart but could not handle it. (Tr. 308). Plaintiff said he wanted to decrease his anxiety so he could handle going to NAMI groups[3]. (Tr. 409). He rated his depression as a six out of ten and anxiety as an eight out of ten. (Tr. 310). He reported impulsivity, inattention, mood swings from stress on the job, having a depressed mood most of the day nearly every day, low energy, muscle tension, low self-esteem, feelings of hopelessness, eating when depressed, recurrent panic attacks that he consistently fears and that keep him from working, sweating, SOB, chest tightness, abdominal distress, dizziness, confusion, shaking, heat sensations, fear of losing control or going crazy, consistent anxiety, worsened anxiety when he leaves the house, racing thoughts, insomnia, hypersomnia, isolating himself, indecisiveness, trouble concentrating and focusing, and lacking interest in things he used to enjoy. (Tr. 310-312, 381-383, 385, 387-389, 409, 413, 575, 581). Plaintiff reported a desire

---

[3] NAMI refers to the National Alliance on Mental Illness. NAMI "provides advocacy, education, support and public awareness so that all individuals and families affected by mental illness can build better lives." https://www.nami.org/About-NAMI, visited on February 24, 2020.

and effort to get on disability. (Tr. 411, 579).

LCPC Lloyd noted Plaintiff appeared well-groomed, overweight and cooperative, and he had appropriate thought content, no perceptional disturbances, logical thought processes, an anxious and depressed mood, labile affect, intact memory, fair insight and judgment, and impaired attention. (Tr. 311, 386, 414-415, 582-583). LCPC Lloyd concluded Plaintiff needed work on independent self-care, independent interactions with peers and immediate social contact in activities, steps or activities that effectively cope with symptoms, developing supportive social relationships, and independent management of basically diverse nutritional needs. (Tr. 311, 386, 419, 587). LCPC Lloyd noted Plaintiff's symptoms cause him clinically significant distress or impairment in social, occupational, or other important areas of functioning. (Tr. 312). Plaintiff's primary diagnoses were panic disorder without agoraphobia, dysthymic disorder, and insomnia. (Tr. 313, 388, 416, 584). Recommendations and plans included outpatient individual and group therapy counseling, such as primary and behavioral healthcare integration (PBHCI), and community support. (Tr. 315, 320, 390, 419, 585, 587).

Plaintiff presented to Reno Ahuja, a psychiatrist, at Centerstone on January 27, 2016, reporting situational anxiety, fine concentration, and good energy, motivation, sleep and appetite. A mental status exam revealed a constricted affect, logical thought processes, intact memory, and fair concentration, insight and judgment. Dr. Ahuja's plan included tapering Abilify, continuing therapy and exercising, and diagnoses included panic disorder without agoraphobia, dysthymic disorder, and insomnia. (Tr. 370-371,

373).

On February 11, 2016, Fred Klug, Ph.D., a licensed clinical psychologist, performed a consultative exam at the request of the agency. Plaintiff said he cannot work because he "is disabled and had a nervous breakdown in 2009." (Tr. 324). Dr. Klug noted Plaintiff had an adequate attention span, good concentration, poor short-term memory, intact immediate and long-term memory, good reasoning, and poor abstract thinking, judgment and insight. (Tr. 325-327). Plaintiff reported worrying about fifty minutes an hour every day and trying to get on disability. He also reported feeling depressed two days a week since 2009 when he had his nervous breakdown. He had a dysphoric and tense mood and reported being nervous. (Tr. 326-327).

Plaintiff presented to Dr. Ahuja seven times between March and December 2016 complaining of high anxiety sometimes at a seven out of ten, worsening symptoms regarding depression and anxiety, and being happy and then sad. (Tr. 365, 405, 649, 653, 656, 658). He reported a good mood at times with improved anxiety, no panic attacks, fine concentration, and good energy, sleep and appetite. (Tr. 365-366, 401, 405, 649, 658). At other times, however, Plaintiff reported a "pretty bad" mood saying he wanted to sleep all the time, nervousness, poor energy, poor motivation, bad social anxiety, and difficulty attending NAMI groups. (Tr. 365, 401, 405, 649).

Mental status exams often revealed a constricted affect while sometimes revealing a worried, depressed, anxious or appropriate mood and affect, and they always revealed logical thought processes, intact memory, and fair to normal concentration, insight and

judgment. (Tr. 366, 402, 406, 650, 654, 657, 659). At one point, Dr. Ahuja determined Plaintiff's status may have worsened due to tapering Abilify and being on multiple medications. Dr. Ahuja's assessments included panic disorder without agoraphobia, dysthymic disorder, and insomnia, and plans included medication management, psychotherapy, and exercise. (Tr. 366, 368, 402, 404, 406, 408, 648, 650, 652, 654, 657, 659).

Plaintiff presented to Kathryn McMurphy, a physician assistant, at Shawnee Health Care Marion twice in October 2016 complaining of left shoulder pain that is mild to moderate in severity, intermittent, fluctuating, and aching. (Tr. 553, 556). Associated symptoms included joint tenderness, nocturnal pain, and tingling in the arms. Plaintiff said the pain is worse at night, and he injured the shoulder in a fall a few years prior. (Tr. 556). PA McMurphy noted normal physical exams, no tenderness over the left shoulder, and full range of motion without pain on movement, and she started Plaintiff on Meloxicam. (Tr. 554-555, 558).

Plaintiff was discharged from treatment with The H Group on March 7, 2017, on his own accord. LCPC Lloyd indicated Plaintiff had fair progress in treatment. (Tr. 623-624).

Plaintiff presented to Diane Washington, a psychiatrist, at Centerstone on March 27, 2017, complaining of anxiety, depression, and sleep disturbance from nightmares. He reported feelings of doom and feeling nervous all the time, restless, and fidgety. A mental status exam revealed a facial tic Plaintiff was unaware of, normal insight and judgment, intact memory, constricted mood and affect, normal attention, "mask like" facial

expression, and logical thought processes. The diagnoses included insomnia, persistent depressive disorder, and panic disorder, and plans included medications. (Tr. 661-662).

Plaintiff presented to PA McMurphy in March, July, August and October 2017, and PA McMurphy noted mild tenderness of the paracervical musculature and submandibular[4] tenderness. (Tr. 426, 429, 433, 449). PA McMurphy ordered an x-ray of Plaintiff's cervical spine and referred Plaintiff to physical therapy. (Tr. 463).

Plaintiff presented to Janice Fisher, a licensed practical nurse, at Centerstone on June 29, 2017, for medication management and complaining of depression, anxiety, and nightmares. (Tr. 663).

Plaintiff underwent a cervical spine x-ray on July 26, 2017, and the impression revealed, "No acute osseous abnormality of the cervical spine. Mild to moderate degenerative disc disease at C6-7." (Tr. 504).

Plaintiff presented to Paul Carter, a psychiatrist, at Centerstone on November 9, 2017, for medication management and complaining of feeling overwhelmed, having tearful outbursts with small minor triggers, social nervousness, nightmares, ruminative thoughts, restlessness, and difficulty controlling worry. A mental status exam revealed normal insight and judgment, intact memory, normal attention, and logical thought processes. Diagnoses included insomnia, persistent depressive disorder and panic disorder, and plans included medications and anxiety management. (Tr. 666-667).

---

[4] Submandibular refers to, "Beneath the mandible or lower jaw." https://medical-dictionary.thefreedictionary.com/submandibular, visited on February 24, 2020.

Dr. Carter filled out a medical statement on January 18, 2018, reporting Plaintiff had decreased energy, generalized persistent anxiety, apprehensive expectation, and recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress. He reported Plaintiff had moderate restriction of activities of daily living and marked difficulty in maintaining social functioning. (Tr. 670). He reported Plaintiff had deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner. He reported Plaintiff as moderately impaired in the ability to understand, remember and carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, the ability to work in coordination with and proximity with others without being distracted by them, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and the ability to respond appropriately to changes in the work setting. Dr. Carter reported Plaintiff being markedly impaired in the ability to sustain an ordinary routine without special supervision, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, the ability to interact appropriately with the general public, the ability to travel in unfamiliar places or use public transportation, and the ability to set realistic goals or make plans independently of others. Dr. Carter said Plaintiff's anxiety symptoms impair his ability to work consistently without interruption

from said symptoms. (Tr. 670-672).

### 4. Medical Opinions

Ellen Rozenfeld, Psy.D., a state agency psychological consultant, concluded in a reconsideration determination that Plaintiff has moderate difficulties in maintaining social functioning and concentration, persistence or pace. (Tr. 104). Dr. Rozenfeld concluded Plaintiff has sustained concentration and persistence limitations. She found Plaintiff is moderately limited in the ability to carry out detailed instructions and the ability to maintain attention and concentration for extended periods. (Tr. 107). She also found Plaintiff is moderately limited in the ability to interact appropriately with the general public and, therefore, limited Plaintiff to low public contact. (Tr. 108).

Joseph Mehr, Ph.D., a state agency psychological consultant, concluded Plaintiff has mild difficulties in maintaining concentration, persistence or pace. (Tr. 90). Due to Dr. Rozenfeld's reconsideration opinion that Plaintiff was moderately limited as opposed to mildly limited, the ALJ gave great weight to the reconsideration determination. (Tr. 37).

ANALYSIS

First, Plaintiff asserts the ALJ erred in evaluating Plaintiff's physical RFC. Plaintiff suggests the record indicates an inability to lift fifty pounds. However, Plaintiff points to his own testimony for support that he could not lift that much, as well as a few medical records regarding neck and cervical spine issues. Plaintiff furthers his argument saying the ALJ failed to explain how the cervical imaging studies, physical findings and activities of daily living were evidence of an ability to lift and/or carry fifty pounds. Yet,

the ALJ supports his RFC finding as to why and how Plaintiff can perform work at the medium exertional level at Tr. 36 and 38.

Plaintiff claims the ALJ erred by not relying on a medical opinion to assess Plaintiff's lifting capacity. The ALJ "must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions. . ." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). The determination of RFC is an administrative finding that is reserved to the Commissioner. 20 C.F.R. §404.1527(d)(2). at Tr. 36, the ALJ discussed Plaintiff's medical records regarding neck and cervical spine issues, noting objective findings of mild tenderness and full range of motion without increased pain, and explaining how these records support a medium exertional level. The ALJ also discussed the record regarding Plaintiff's neck and cervical spine issues at Tr. 37 and solidified his decision at Tr. 38. Here, the ALJ considered the medical evidence and formulated an RFC assessment based on the record as a whole without relying on his own lay interpretation of the medical evidence. That is the ALJ's proper role. 20 C.F.R. §404.1527(d)(2). Therefore, Plaintiff's first issue is denied.

Second, Plaintiff asserts the ALJ erred in evaluating the opinion of Dr. Paul Carter, M.D. Dr. Carter treated Plaintiff, but the ALJ was not required to fully credit his opinion because of that status; "while the treating physician's opinion is important, it is not the final word on a claimant's disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted). A treating source's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent

with other substantial evidence in the record. *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir.

2016), citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

Plaintiff filed his application before March 27, 2017. The applicable regulation, 20

C.F.R. § 404.1527(c)(2), provides, in part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. [Emphasis added]

If the ALJ decides not to give the opinion controlling weight, he is to weigh it

applying the factors set forth in § 404.1527(c)(1)-(6). Supportability and consistency are

two important factors to be considered in weighing medical opinions. In a nutshell, "[t]he

regulations state that an ALJ must give a treating physician's opinion controlling weight

if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical

and laboratory diagnostic techniques [,]' and (2) it is 'not inconsistent' with substantial

evidence in the record." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010).

Here, the ALJ explained that he gave little weight to Dr. Carter's opinion because

(1) Plaintiff showed the ability to work despite his mental health symptoms; (2) Plaintiff

improved with medications and therapy; (3) Plaintiff had normal mental status

examinations in 2017; (4) Plaintiff had moderate GAF scores; and (5) Plaintiff declined

additional therapy, despite there being aspects of his treatment that needed improvement. The ALJ said, "The findings in the treating records from Dr. Carter were inconsistent with these reports and the claimant's activities and functioning in the record demonstrated greater abilities." (Tr. 37). The ALJ further explained his reasoning at Tr. 30 regarding Dr. Klug's opinion.

Plaintiff's argument ignores much of the ALJ's discussion. In general, he argues that the ALJ did not explain enough of the inconsistencies found between Dr. Carter's opinion and the medical records. However, that argument distorts the ALJ's explanation. The ALJ discussed the medical records in detail at Tr. 31-36. The ALJ's discussion illustrates that the treatment records do not support the treater's opinion. For example, he pointed out that Plaintiff's mental status exams were normal in 2017, which does not support the finding of "marked" impairments as suggested by Dr. Carter.

In light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). The ALJ met the minimal articulation standard here.

Plaintiff's argument is little more than an invitation for this Court to reweigh the evidence. He has not identified a sufficient reason to overturn the ALJ's conclusion on this issue. Even if reasonable minds could differ as to whether Plaintiff was disabled at the relevant time, the Court cannot substitute its judgment for that of the ALJ in

reviewing for substantial evidence. *Burmester,* 920 F.3d at 510; *Shideler v. Astrue,* 688 F.3d 306, 310 (7th Cir. 2012). For these reasons, this Court rejects this issue.

Third, Plaintiff asserts the ALJ erred in evaluating Plaintiff's mental RFC regarding concentration, persistence, and pace. The ALJ's RFC assessment and the hypothetical question posed to the VE must both incorporate all the limitations that are supported by the record. *Yurt v. Colvin,* 758 F.3d 850, 857 (7th Cir. 2014). This is a well-established rule. *See Stewart v. Astrue,* 561 F.3d 679, 684 (7th Cir. 2009) (collecting cases). If the ALJ finds that a plaintiff has a moderate limitation in maintaining concentration, persistence or pace, that limitation must be accounted for in the hypothetical question posed to the VE. The Seventh Circuit has repeatedly held, with exceptions not applicable here, that a limitation to simple, repetitive tasks or unskilled work does not adequately account for a moderate limitation in maintaining concentration, persistence or pace. *O'Connor-Spinner v. Astrue,* 627 F.3d 614, 620 (7th Cir. 2010); *Yurt v. Colvin,* 758 F.3d at 857; *Varga v. Colvin,* 794 F.3d 809, 814 (7th Cir. 2015); *Taylor v. Colvin,* 829 F.3d 799, 802 (7th Cir. 2016); *Moreno v. Berryhill,* 882 F.3d 722, 730 (7th Cir. 2018), as amended on reh'g (Apr. 13, 2018); *Winsted v. Berryhill,* 915 F.3d 466, 471 (7th Cir. 2019), *DeCamp v. Berryhill,* 916 F.3d 671, 676 (7th Cir. 2019). "The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity." *O'Connor-Spinner,* 627 F.3d at 620.

Here, the ALJ found that Plaintiff had moderate difficulties in maintaining concentration, persistence or pace at step three of the sequential analysis when

determining whether Plaintiff's mental impairments meet or equal a listed impairment. The ALJ noted that, while the step three determination is not a mental RFC assessment, the ultimate RFC assessment "reflects the degree of limitation the undersigned has found in the 'paragraph B' mental functional analysis." (Tr. 31). The ALJ gave great weight to the State agency psychological consultant's opinion that Plaintiff had moderate difficulties in maintaining concentration, persistence or pace.

In regard to Plaintiff's mental limitations, the ALJ's RFC finding says:

> He can understand and remember simple instructions and carry out simple, routine and rote tasks that require little independent judgment or decision-making. He can have no more than brief and incidental public interaction on less than an occasional basis. He must work in a stable work setting where there is little daily change in terms of tools used, the processes employed, or the setting itself, and change, when necessary, is introduced gradually. He can have occasional interaction with co-workers and supervisors.

(Tr. 31). Plaintiff suggests this language does not account for moderate limitations in concentration, persistence or pace, and this Court agrees. A limitation to simple, routine and rote tasks with little to no changes does not account for difficulties in concentration arising from anxiety and depression. *Varga v. Colvin*, 794 F.3d at 815. Moreover, the ALJ used the terminology that the Seventh Circuit has continually viewed as insufficient.

There are two recent Seventh Circuit cases that speak directly to this issue: *Martin v. Saul*, 950 F.3d 369 (7th Cir. 2020) and *Crump v. Saul*, 932 F.3d 567 (7th Cir. 2019). In *Martin*, the court held the ALJ correctly accounted for Martin's concentration, persistence or pace limitations by not "assuming that restricting [Martin] to unskilled work would

account for her mental impairments." *Id*. at 374. "The ALJ incorporated pace-related limitations by stating that Martin needed flexibility and work requirements that were goal-oriented." *Id*. The ALJ in *Crump* used language in the RFC that the Seventh Circuit has repeatedly found insufficient such as, "simple, routine, repetitive tasks with few workplace changes." *Crump*, 932 F.3d at 569. The court held the ALJ failed to incorporate limitations like Crump's likelihood of being off-task twenty percent of the time. *Id*. at 570.

Here, the ALJ did not go to lengths as the ALJ in *Martin* did. The present case is similar to *Crump* in that the ALJ limited Plaintiff to work involving "simple, routine and rote tasks," without adding more relating to concentration, persistence or pace. This, as established above, is not enough. "More to it, observing that a person can perform simple and repetitive tasks says nothing about whether the individual can do so on a sustained basis, including, for example, over the course of a standard eight-hour work shift." *Crump*, 932 F.3d at 570. The Seventh Circuit put it succinctly in *Martin*:

> As we have labored mightily to explain, however, the relative difficulty of a specific job assignment does not necessarily correlate with a claimant's ability to stay on task or perform at the speed required by a particular workplace. . . . Put another way, someone with problems concentrating may not be able to complete a task consistently over the course of a workday, no matter how simple it may be.

950 F.3d at 373-74. Therefore, without more, the RFC does not adequately account for moderate limitations in concentration, persistence or pace.

The Commissioner relies on *Jozefyk v. Berryhill*, 923 F.3d 492 (7th Cir. 2019). There, the Seventh Circuit rejected Plaintiff's argument that it was error to omit a reference to a

moderate limitation in concentration, persistence or pace from the RFC assessment and hypothetical question where "according to the medical evidence, his impairments surface only when he is with other people or in a crowd." *Jozefyk*, 923 F.3d at 498. That case is distinguishable from the case at hand on that basis. The Seventh Circuit explained its holding in *Jozefyk* in a later case:

> In closing, we owe a word to the Commissioner's reliance on our recent decision in *Jozefyk v. Berryhill*, 923 F.3d 492 (7th Cir. 2019). We do not read *Jozefyk* to save the shortfalls in the ALJ's analysis here. In *Jozefyk*, we determined that any error in formulating the RFC was harmless because the claimant had not testified about any restrictions in his capabilities related to concentration, persistence, or pace, and the medical evidence did not otherwise support any such limitations. 923 F.3d at 498. As the Commissioner concedes, the facts here are different. The medical evidence plainly shows, and the ALJ recognized, that Crump suffers from CPP limitations. And, unlike in *Jozefyk*, Crump testified consistently with the medical treatment notes about how her bipolar disorder impairs her ability to concentrate well enough to work for a sustained period.

*Crump*, 932 F.3d at 571. Here, Plaintiff testified that he had trouble concentrating on job duties, and his mental health symptoms made him confused.

The Commissioner suggests that, according to *Jozefyk*, Plaintiff should have cited to "evidence suggesting what additional limitations the ALJ needed to include to accommodate his moderate limitations in concentration, persistence, or pace." Doc. 32, p. 14-15. The Court disagrees for reasons stated above. The Commissioner also cites *Dudley v. Berryhill*, 773 F. App'x 838 (7th Cir. 2019), but that case is nonprecedential. "Opinions, which may be signed or per curiam, are released in printed form, are published in the Federal Reporter, and constitute the law of the circuit. Orders, which are unsigned, are

released in photocopied form, are not published in the Federal Reporter, and are not treated as precedents." Seventh Circuit Rule 32.1(b).

The Commissioner does not address the central point here, which is that the ALJ found that Plaintiff has moderate limitations in maintaining concentration, persistence, or pace, but failed to account for that limitation in the RFC assessment and the hypothetical question.

Lastly, the Commissioner points out that the "B" criteria have been amended and attempts to minimize the significance of the findings of moderate limitations by pointing out that "moderate" limitation means that a claimant's ability to maintain concentration, persistence or pace independently, appropriately, effectively, and on a sustained basis is fair. See, Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138, 66164, 2016 WL 5341732 (Sept. 26, 2016) (effective Jan. 17, 2017). But a moderate limitation is not the same as "no" limitation. A "mild" limitation means that functioning is "slightly" limited and a "marked" limitation means that functioning is "seriously limited." Moderate is between mild and marked. 81 Fed. Reg. 66138, 66164. Therefore, a moderate limitation is more than a slight limitation, and the ALJ may not overlook the state agency consultant's designation of moderate limitations in the RFC. Further, these definitions do not represent a change in the meaning of these terms:

> Third, we have used the words "mild," "moderate," "marked," and "extreme" under our prior rules for many years. Although we did not provide definitions for most of these terms until now, the definitions in final 12.00F are consistent with how our adjudicators have understood and used those words in our program since we first introduced the rating scale in

1985. As a result, the definitions we provide in these rules do not represent a departure from prior policy.

81 FR 66138, 66147.

The ALJ's conclusion regarding Plaintiff's social limitations also refutes Defendant's attempt to minimize the significance of the findings of moderate limitations. He found Plaintiff to be moderately limited in interacting with others, leading him to limit Plaintiff to no more than brief and incidental public interaction on less than an occasional basis. Dr. Rozenfeld likewise found that Plaintiff was moderately limited in ability to interact with the public and therefore limited Plaintiff to low public/social contact. This demonstrates that both the state agency consultant and the ALJ understood that a moderate limitation is serious enough to require accommodation.

For the reasons stated above, the ALJ did not adequately account for concentration, persistence or pace within the RFC finding. Therefore, this requires remand.

In his fourth issue, Plaintiff asserts the ALJ erred in evaluating Plaintiff's subjective allegations. This Court rejects this argument. SSR 16-3p supersedes the previous SSR on assessing the reliability of a claimant's subjective statements. SSR 16-3p became effective on March 28, 2016 and is applicable here. 2017 WL 5180304, at *1. The new SSR eliminates the use of the term "credibility," and clarifies that symptom evaluation is "not an examination of an individual's character." SSR 16-3p continues to require the ALJ to consider the factors set forth in the applicable regulation, 20 C.F.R. § 404.1529. *Ibid.* at *10.

The new SSR does not purport to change the standard for evaluating the claimant's allegations regarding his symptoms. Thus, prior Seventh Circuit precedents continue to apply.

The findings of the ALJ as to the accuracy of the Plaintiff's allegations are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

Plaintiff argues that the ALJ did not provide an adequate explanation as to the inconsistencies between Plaintiff's subjective allegations, the objective clinical evidence, and the treatment notes. On the contrary, the ALJ did just that at Tr. 32 and continued by explaining the testimony and medical records from Tr. 31-38. Plaintiff also argues the ALJ erred by saying Plaintiff's activities of daily living discounted his subjective allegations. However, the ALJ did not rely solely on Plaintiff's activities of daily living to come to his conclusion. The ALJ relied upon the record as a whole. Therefore, this assertion is incorrect.

This Court disagrees that the ALJ incorrectly said Plaintiff "was never assessed with more than a moderate level of impairment in the treating records." A mental status

exam performed by Dr. Carter in November 2017 was essentially normal. (Tr. 667). Later, Dr. Carter concluded in a medical statement in January 2018 that Plaintiff was markedly impaired in the ability to sustain an ordinary routine, the ability to complete a normal workday and workweek and to perform at a consistent pace, the ability to interact appropriately with the general public, the ability to travel in unfamiliar places or use public transportation, and the ability to set realistic goals or make plans independently of others. (Tr. 672). The ALJ gave Dr. Carter's opinion little weight for the reasons mentioned above in the analysis of Plaintiff's second issue, and the ALJ explained in his decision the great differences between the treating record and this medical statement.

The ALJ "need not provide a complete written evaluation of every piece of testimony and evidence." *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015) (citation and internal quotations omitted). However, the Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). Here, the ALJ relied on the record as a whole in evaluating Plaintiff's subjective allegations as required.

This Memorandum and Order should *not* be construed as an indication that the Court believes Plaintiff was disabled during the relevant period or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## CONCLUSION

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED: March 30, 2020**

*/s/ Mark A. Beatty*
**MARK A. BEATTY**
**United States Magistrate Judge**